UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

ROBERT L. BURT II,                              )
                                                )
            Plaintiff,                          )
                                                )
v.                                              )        No.:   3:09-CV-346
                                                )               (VARLAN/SHIRLEY)
VIOLA MILLER, Commissioner,                     )
Tennessee Department of Children's Services,    )
in her official and personal capacities;        )
DEANNA HARVILLE,                                )
in her official and personal capacities;        )
SANDRA HENDERSON,                               )
in her official and personal capacities,        )
GEORGE EDWARD S. PETTIGREW,                     )
LESLIE CAMPBELL; and                            )
ANGELA HUDDLESTON,                              )
                                                )
            Defendants.                         )

## <u>MEMORANDUM OPINION</u>

This civil action is before the Court on defendants' Motion to Dismiss First Amended

Complaint [Doc. 14].  Plaintiff filed a response in opposition to the motion to dismiss [Doc.

18].  Defendants filed a reply to the response in opposition [Doc. 21].  The motion to dismiss

is now ripe for the Court's consideration.

## I.      Background

Plaintiff, a resident of Jefferson County, Tennessee, filed a first amended complaint

pursuant to which he alleges the following: Plaintiff is the custodial parent of two minor

children, LB and CB, born to plaintiff and Misty Summers [Doc. 7, ¶ 5].  Defendant Viola

Miller is the Commissioner of the Tennessee Department of Children's Services (the "DCS"), the Tennessee agency responsible for investigating allegations of child abuse [*Id.*, ¶ 6]. Defendant Deanna Harville is a case manager in Jefferson County for Child Protective Services ("CPS"), a division of DCS [*Id.*, ¶¶ 6, 7]. Defendant Sandra Henderson is a "team leader" and/or case manager for the Jefferson County CPS, and is Ms. Harville's supervisor [*Id.*, ¶ 8]. Defendant Leslie Campbell is an investigator or case manager for the CPS in Sullivan County or Washington County, Tennessee [*Id.*, ¶ 9]. Defendant George Edward S. Pettigrew was an assistant general counsel with the DCS at all times relevant to this case [*Id.*, ¶ 10].

Plaintiff and Ms. Summers were divorced in July 2006 [*Id.*, ¶ 12]. At the time of the divorce, CB was a young child, and LB was less than three years old [*Id.*]. Following the divorce, plaintiff was granted custody of the two minor children, and Ms. Summers was granted limited visitation rights under supervision [*Id.*]. After an extended period of supervised visitation, plaintiff permitted Ms. Summers to visit the children without supervision [*Id.*, ¶ 15].

On or about August 1, 2008, plaintiff took the children for an unsupervised visitation with Ms. Summers and informed Ms. Summers that she would be responsible for half the cost of a recent and significant dental expense for CB [*Id.*, ¶ 16]. Ms. Summers became upset after hearing this news [*Id.*]. The next day, Ms. Summers took LB to the emergency room of the Holston Valley Hospital for an examination [*Id.*, ¶ 17]. On that occasion, Ms. Summers told the medical personnel a "false and despicable tale of sexual abuse of LB by

plaintiff" [*Id.*]. The attending physician then performed a "physical sexual examination" of LB; this examination prompted a report to CPS [*Id.*].

Ms. Campbell, under instructions from Ms. Harville, later met with Ms. Summers to investigate Ms. Summers's allegations of sexual abuse [*Id.*, ¶ 20]. As a result of this meeting, Ms. Harville appeared at plaintiff's residence on or about August 3, 2008 with law enforcement officers and accused plaintiff of sexually abusing LB [*Id.*, ¶ 27]. Ms. Harville asked plaintiff to sign a document pursuant to which plaintiff would have agreed to discontinue contact with his children; plaintiff, however, refused to sign the document [*Id.*].

On or about August 8, 2008, the Juvenile Court for Jefferson County issued a restraining order preventing plaintiff from having contact with LB [*Id.*, ¶ 30]. The Juvenile Court later issued a similar restraining order with respect to CB [*Id.*, ¶ 41]. The Juvenile Court appointed a guardian ad litem for LB, and later appointed a guardian ad litem for CB [*Id.*, ¶ 33].[1] Plaintiff then petitioned the Circuit Court for Jefferson County for the return of his children or, in the alternative, for transfer of custody of the children from Ms. Summers to plaintiff's parents [*Id.*, ¶ 38]. The Circuit Court deferred ruling on plaintiff's request pending the outcome of a hearing in the case in Juvenile Court, but did grant plaintiff's parents visitation rights [*Id.*].

---

[1] Angela Huddleston–the guardian ad litem originally appointed to represent LB and CB in this case–was named as a defendant in the first amended complaint [*see* Doc. 7]. Plaintiff voluntarily dismissed Ms. Huddleston as a defendant in this case on November 16, 2009 [*see* Doc. 8].

The parties later appeared for a preliminary hearing in Juvenile Court [*Id.*, ¶ 49]. At this hearing, the Juvenile Court granted temporary custody of the children to plaintiff's parents [*Id.*]. The Juvenile Court held an adjudicatory hearing on November 25, 2008 and the court heard testimony from two witnesses [*Id.*, ¶ 60]. The Juvenile Court then continued the hearing to a later date [*Id.*].

Before the next hearing date, a new guardian ad litem was appointed for LB and CB [*Id.*, ¶ 62]. After investigating the case, the new guardian recommended that plaintiff be permitted unlimited visitation rights with his children subject to supervision by plaintiff's parents [*Id.*]. At the next Juvenile Court hearing, held on April 7, 2009, DCS announced a nonsuit, and the case against plaintiff was dismissed [*Id.*, ¶ 63]. The children were returned to plaintiff and they have remained in his custody since that time [*Id.*]. Plaintiff's name has nevertheless been placed on an internal DCS registry of "indicated" perpetrators of child sexual abuse [*Id.*, ¶ 64]. Defendants have refused to remove plaintiff's name from this registry [*Id.*, ¶ 65]. In addition, defendants Harville and Henderson (and "possibly" defendants Miller and Pettigrew) disclosed to school personnel in Sullivan County copies of at least one confidential Juvenile Court proceeding containing identifying information and allegations of sexual abuse against plaintiff, "ostensibly" to enable Ms. Summers to enroll CB in school [*Id.*, ¶ 42].

On the basis of these allegations, plaintiff brings a claim under 42 U.S.C. § 1983 for deprivations of his rights under the federal Constitution, and civil conspiracy [*Id.*, ¶¶ 92-121]. Plaintiff also brings state law claims for violations of the Tennessee Constitution, for abuse

of process, invasion of privacy, conspiracy, and outrageous conduct [*Id.*, ¶¶ 134-59]. He seeks injunctive and declaratory relief, damages, and attorney's fees [*see* Doc. 7].

Defendants filed a motion to dismiss the first amended complaint [Doc. 14]. Defendants contend that they are entitled to immunity in their official capacities insofar as plaintiff seeks money damages; that they are entitled to absolute quasi-judicial immunity with respect to their actions taken in connection with the judicial process; that they are entitled to qualified immunity for the remaining actions outlined in the complaint; and that plaintiff has failed to state a claim for supervisory liability [*Id.*]. Defendants also contend that, because the Court should dismiss plaintiff's Section 1983 claims, the Court lacks jurisdiction over plaintiff's state law claims and that such also should be dismissed [*Id.*]. Plaintiff filed a response in opposition to the motion to dismiss, arguing that defendants are not entitled to the immunity they have asserted [Doc. 18]. Defendants filed a reply to plaintiff's response addressing the authority plaintiff cited with respect to immunity [Doc. 21].

The Court has carefully considered the parties' filings in light of the applicable law. For the reasons that follow, the motion to dismiss will be granted. This case will be dismissed. The Clerk will be directed to close this case.

## II.    Standard of Review

Federal Rule of Civil Procedure 8(a) sets out a liberal pleading standard. To survive a motion to dismiss, a pleading need contain only "'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the [opposing party] fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*,

550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). Detailed

factual allegations are not required, but a party's "obligation to provide the 'grounds' of [its]

'entitle[ment] to relief' requires more than labels and conclusions." *Twombly*, 550 U.S. at

555. A formulaic recitation of the elements of a cause of action will not do. *Id.* Nor will an

"unadorned, the-defendant-unlawfully harmed-me accusation." *Ashcroft v. Iqbal*, 129 S. Ct.

1937, 1949 (2009). A pleading must instead "contain sufficient factual matter, accepted as

true, to 'state a claim to relief that is plausible on its face.'" *Id.* (quoting *Twombly*, 550 U.S.

at 570). "Determining whether a complaint states a plausible claim for relief will [ultimately]

. . . be a context-specific task that requires th[is Court] to draw on its judicial experience and

common sense." *Iqbal*, 129 S. Ct. at 1937.

## III.    Analysis

As noted, defendants contend that they are entitled to immunity in their official

capacities insofar as plaintiff seeks money damages; that they are entitled to absolute quasi-

judicial immunity with respect to their actions taken in connection with the judicial process;

that they are entitled to qualified immunity for the remaining actions outlined in the

complaint; that plaintiff fails to state a claim for supervisory liability; and that plaintiff's state

law claims should be dismissed for lack of jurisdiction [*see* Doc. 14]. The Court considers

these arguments below.

**A.      Whether Defendants are Entitled to Immunity in Their Official Capacities Insofar as Plaintiff Seeks Money Damages**

Defendants first contend that they are entitled to immunity in their official capacities insofar as plaintiff seeks money damages [*see id.*].  In response, plaintiff avers that he "does not seek damages against defendants in their official capacities" [Doc. 18].  Rather, he explains that "[c]ertain defendants are named in their official capacities to enable the Court to provide the injunctive and declaratory relief requested" [*Id.*].  The Court thus rejects as moot defendants' argument that defendants are entitled to immunity in their official capacities insofar as plaintiff seeks money damages.

**B.      Whether Defendants are Entitled to Absolute Quasi-Judicial Immunity with Respect to Their Actions Taken in Connection with the Judicial Process**

Defendants also contend that they are entitled to absolute quasi-judicial immunity for the actions they took in connection with the judicial process [*see* Doc. 15].  These actions, as alleged in plaintiff's first amended complaint, include:

- the securing of an ex parte no contact restraining order against plaintiff prohibiting plaintiff from having any contact with his minor child LB, without notice to plaintiff or to his counsel;

- the filing of copies of Juvenile Court pleadings containing information identifying plaintiff, as well as allegations against plaintiff–all of which plaintiff contends must be maintained in confidentiality to protect them from public disclosure–as attachments to public filings in the Circuit Court;

- the fabrication of grounds to continue to withhold custody of CB from plaintiff by defendants Miller, Harville, Henderson, and Pettigrew;

- the securing of an ex parte no contact restraining order against plaintiff prohibiting plaintiff from having any contact with his minor child CB, without notice to plaintiff or to his counsel;

- the decision of defendants Miller, Harville, Henderson, and Pettigrew to withhold plaintiff's children from him, to prevent him from having any contact with them or to know whether they were safe, until a hearing was held in Jefferson County Juvenile Court sixteen days after plaintiff's children were taken from his custody;

- the denial of a custody hearing within 72 hours of plaintiff's children being removed from his custody;

- defendants' "improper" reading of documents into the record, and the making of "repeated and improper objections," at the deposition of defendant Harville;

- the refusal of defendants Miller, Harville, Henderson, and Pettigrew to participate in discovery;

- the attempt by defendants to deprive plaintiff of the counsel of his choice, by requesting that the Court disqualify plaintiff's counsel for submitting an affidavit reporting discovery obstruction and intimidation by a nonparty who was a relative of Ms. Summers's and who was a potential witness, and by causing a subpoena to issue for plaintiff's counsel to appear as a witness at the adjudicatory hearing;

- the representation by defendant Pettigrew that he intended to introduce into evidence a videotape of forensic interviews of LB and CB, when in fact no such videotape existed; and

- the decision of defendants Harville and Henderson, and "possibly" of defendants Miller and Pettigrew, not to obtain or preserve contemporaneous records of forensic interviews of LB and CB, which plaintiff characterizes as "critical exculpatory evidence."

[Doc. 7, ¶¶ 30, 39, 41, 46, 47, 51, 52, 53, 55, 56, 59]. Plaintiff argues that absolute quasi-judicial immunity cannot shield defendants from liability in connection with these actions [*see* Doc. 18].

8

The Court agrees with defendants. "[S]ocial workers who initiate proceedings related to the welfare of a child are entitled to absolute immunity while functioning in roles intimately associated with the judicial phase of proceedings." *Rippy v. Hattaway*, 270 F.3d 416, 422 (6th Cir. 2001). *See also Butz v. Economou*, 438 U.S. 478, 515 (1978) ("[A]gency officials performing certain functions analogous to those of a prosecutor should be able to claim absolute immunity with respect to such acts."). This immunity exists because "state employees who are responsible for the prosecution of child neglect . . . petitions," and whose duty it is "to protect the health and well-being of . . . children," "must be able to perform the necessary tasks to achieve this goal without the worry of intimidation and harassment from dissatisfied parents." *Kurzawa v. Mueller*, 732 F.2d 1456, 1458 (6th Cir. 1984).

Moreover, absolute immunity applies to a prosecutor even where the prosecutor has acted illegally or improperly. *See Koubritti v. Convertino*, 539 F.3d 459, 467 (6th Cir. 2010) ("[P]rosecutors have absolute immunity from civil liability for the non-disclosure of exculpatory information at trial.") (citing *Imbler v. Pachtman*, 424 U.S. 409, 431 n.34 (1976)); *Cady v. Arenac County*, 574 F.3d 334, 340 (6th Cir. 2009) ("[C]ourts will bar § 1983 suits arising out of even unquestionably illegal or improper conduct by the prosecutor so long as the general nature of the action in question is part of the normal duties of a prosecutor."); *McKinley v. City of Mansfield*, 404 F.3d 418, 438 (6th Cir. 2005) ("[P]rosecutors are absolutely immune from suit" "even when it is alleged that [they] knowingly presented false evidence . . . at trial."; *Hillard v. Williams*, 540 F.3d 220, 221-22 (6th Cir. 1976) (granting immunity to a prosecutor who withheld *Brady* evidence and

condoned false testimony). Such is the case for agency officials responsible for the prosecution of child neglect petitions as well. *See Butz*, 438 U.S. at 516-17 (stating there is no substantial difference between a prosecutor and "an agency official who arranges for the presentation of evidence on the record in the course of an adjudication"); *Kurzawa*, 732 F.2d at 1458 ("[S]tate employees who are responsible for the prosecution of child neglect . . . petitions" "are entitled to absolute immunity.").

Accordingly, even assuming the truth of plaintiff's allegations regarding defendants' actions and misconduct relating to the judicial process set forth above, such actions and misconduct are afforded absolute quasi-judicial immunity.

**C.     Whether Defendants are Entitled to Qualified Immunity for The Remaining Actions Outlined in the Complain**

Defendants next contend that they are entitled to qualified immunity for the remaining actions outlined in plaintiff's first amended complaint [*see* Doc. 15]. Qualified immunity–also known as "good faith" immunity–is an affirmative defense that must be pleaded by the government official invoking it. *Harlow v. Fitzgerald*, 457 U.S. 800, 815 (1982). Once the defense is raised, however, the burden is on the plaintiff to demonstrate that the official is not entitled to qualified immunity. *Miller v. Admin. Office of the Courts*, 448 F.3d 887, 894 (6th Cir. 2006). The defense shields government officials from liability for civil damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Estate of Carter v. City of Detroit*, 408 F.3d 305, 310 (6th Cir. 2005). It exists to protect public officials "from

undue interference with their duties and from potentially disabling threats of liability." *Sample v. Bailey*, 409 F.3d 689, 695 (6th Cir. 2005).

To determine whether qualified immunity exists in a given case, courts in the Sixth Circuit typically employ a two-step analysis, first asking whether, considering all of the allegations in the light most favorable to the injured party, a statutory or constitutional right has been violated; and, second, whether that right was clearly established. *Miller*, 448 F.3d at 893; *Perez v. Oakland County*, 466 F.3d 416, 426-27 (6th Cir. 2006). Panels of the Sixth Circuit occasionally employ a third step to "increase the clarity of the proper" qualified immunity analysis, inquiring "whether the plaintiff has offered sufficient evidence 'to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established constitutional rights.'" *Feathers v. Aey*, 319 F.3d 843, 848 (6th Cir. 2003) (quoting *Williams v. Mehra*, 186 F.3d 685, 691 (6th Cir. 1999) (en banc)); *Estate of Carter*, 408 F.3d at 311 n.2. "In many factual contexts, however . . . the fact that a right is 'clearly established' sufficiently implies that its violation is objectively unreasonable." *Estate of Carter*, 408 F.3d at 311 n.2.

The conduct of which plaintiff complains–and from which defendants seek refuge under qualified immunity–consists of the following:

- defendants' investigation (or lack thereof) into Ms. Summers's allegations of sexual abuse, including their failure to enter or inspect the mobile home Ms. Summers claimed to be her residence, and their failure to question the credibility of Ms. Summers's allegations;

- the decision of defendants Miller, Campbell, Harville, and Henderson to leave the children with Ms. Summers for a period of weeks without

11

monitoring or following up on the safety or appropriateness of their placement with Ms. Summers;

- the refusal of defendants Miller, Campbell, Harville, and Henderson to return the children to plaintiff or to secure the safety of the children when defendants were warned of Ms. Summers's conduct and problems;

- defendant Harville's arrival, with law enforcement officers, at plaintiff's home, her accusation that plaintiff had sexually abused LB, and her presentation to plaintiff of a legal document to plaintiff by which plaintiff would have agreed to discontinue contact with his children;

- the decision of defendants Harville and Henderson, and "possibly" of defendants Miller and Pettigrew, to transmit and disclose to public school personnel in Sullivan County, Tennessee copies of at least one confidential Juvenile Court pleading containing identifying information and allegations of sexual abuse against plaintiff;

- the participation of defendants Harville and Henderson, and "possibly" of defendant Pettigrew, in Ms. Summers's "coaching" of plaintiff's children by instructing Ms. Summers to subject LB to a second physical sexual examination in an attempt to generate verbal statements from the child; and

- the decision of defendants Miller, Harville, and/or Henderson to place plaintiff's name on an internal DCS registry of "indicated" sexual offenders without notice or an opportunity to contest that decision, as well as their continued refusal to remove his name from that registry, thereby depriving him of his property and liberty interests in his good name, reputation, and freedom of employment.

[Doc. 7, ¶¶ 22, 24, 26, 27, 42, 43, 64, 65]. The Court analyzes these claims below on a category-by-category basis.[2]

---

[2] While the Court has outlined all of the steps of the qualified immunity analysis above, it proceeds through these steps in considering plaintiff's allegations below only where such a complete analysis is required.

## 1.    Investigatory Actions[3]

Defendants contend that they are insulated from civil liability by the doctrine of qualified immunity from plaintiff's allegations related to defendants' investigation (or lack thereof) into Ms. Summers's claims of sexual abuse, including plaintiff's allegation that defendants failed to enter or inspect the mobile home Ms. Summers claimed to be her residence, as well as plaintiff's allegation that defendants failed to question the credibility of Ms. Summers's allegations against plaintiff [*see* Doc. 15].  Plaintiff argues that qualified immunity does not apply to these actions because the actions violate clearly established constitutional rights of which a reasonable person would have known [*see* Doc. 18].

In support of his argument that qualified immunity does not apply to these actions, plaintiff contends that "defendants refus[ed] to competently investigate the facts and circumstances" and "willful[ly] ignor[ed] . . . information provided to them" [Doc. 18].  He further contends that these inadequacies in defendants' investigation deprived him of a "liberty interest in the custody of [his] children," and of his "constitutional right to his children and family" [*Id.*].  "It is well settled that parents have a liberty interest in the custody of their children," *Hooks v. Hooks*, 771 F.2d 935, 941 (6th Cir. 1985), as well as a "liberty interest in the integrity of their family."  *Williams v. Pollard*, 44 F.3d 433, 434-45 (6th Cir.

---

[3] The Court applies a qualified immunity analysis to this issue, rather than an absolute quasi-judicial immunity analysis, because the Sixth Circuit Court of Appeals has held that a qualified immunity analysis should be used to resolve issues involving allegations related to a social worker's investigation of child abuse.  *See Achterhof v. Selvaggio*, 886 F.2d 826, 830 (6th Cir. 1989) (finding such actions to be "investigatory or administrative in nature, not prosecutorial, judicial, or otherwise intimately related to the judicial process").

1995) (citing cases). The Court thus assumes for present purposes that plaintiff, having identified a constitutional right he claims was violated, can satisfy the first step of the qualified immunity analysis.

A plaintiff cannot defeat qualified immunity merely by alleging a violation of "extremely abstract rights," however. *Eugene D. v. Karman*, 889 F.2d 701, 706 (6th Cir. 1989). Instead, "the right the official is alleged to have violated must have been 'clearly established' in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.* (internal quotations omitted). Thus, while the "particularity requirement does not mean that the very action in question must have been held unlawful," "it does mean . . . that in light of the pre-existing law, the illegality of the action must be apparent." *Id.*

Plaintiff can point to no case law which demonstrates that his claimed right to have defendants investigate Ms. Summers's allegations of child abuse in the manner plaintiff has described is so "clearly established" that reasonable officials would understand that they were violating this right by failing to perform their investigation in this manner. The Court notes that other courts considering the claims of plaintiffs asserting similar rights have reached the same conclusion. *See, e.g., Kiser v. Garrett*, 67 F.3d 1166, 1173 (5th Cir. 1995) ("[A]lthough a substantive due process right to family integrity has been recognized, the contours of that right are not well-defined, and continue to be nebulous, especially in the context of the state's taking temporary custody of a child during an investigation of possible

14

parental abuse."); *see also Frazier v. Bailey*, 957 F.2d 920, 931 (1st Cir. 1992) ("We agree with other courts that while there may be a due process right of 'familial integrity' of some dimensions, the dimensions of this right have yet to be clearly established.").[4]  Plaintiff's failure to identify a right to family integrity that is sufficiently particularized to put defendant social workers on notice that their actions were unlawful thus entitles defendants to qualified immunity for these actions.  Dismissal of these allegations against defendants is therefore appropriate.[5]

## 2.    Monitoring

Defendants Miller, Campbell, Harville, and Henderson contend that they are insulated from civil liability by the doctrine of qualified immunity with respect to plaintiff's allegations that defendants placed LB and CB in the care of Ms. Summers for a period of weeks without

---

[4] The Court of Appeals for the Sixth Circuit has noted the dilemmas cases like these present, and the role that qualified immunity plays in resolving them.  As the court explained in *Farley v. Farley*, Nos. 98-6114, 98-6115, 2000 WL 1033045, at * 4 (6th Cir. July 19, 2000) (quoting *Van Emrik v. Chemung County Dep't of Soc. Servs.*, 911 F.2d 863, 866 (2d Cir. 1990)), "[W]e are cognizant of the Hobson's choice that social workers face when determining whether to interfere with the custody rights of parents: 'If they err in interrupting parental custody, they may be accused of infringing the parents' constitutional rights.  If they err in not removing the child, they risk injury to the child and may be accused of infringing the child's rights' . . . Qualified immunity is a shield to protect social workers who must make this difficult decision if their actions are objectively reasonable."

[5] Because the Court finds that plaintiff has not identified a "clearly established" right under step two of the qualified immunity analysis, the Court need not consider the third step of the analysis that some panels of the Sixth Circuit have employed, namely, asking whether the plaintiff has offered sufficient evidence to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established constitutional rights.  Even were the Court to consider this step, however, it would not find the actions of the social workers in this case to be objectively unreasonable.  *See* discussion *infra* Part III.C.2.

monitoring or following up on the safety or appropriateness of that placement. The Court agrees.

In *Deshaney v. Winnebago County Dep't of Soc. Servs.*, 489 U.S. 189, 196 (1989), the Supreme Court held that "the Due Process Clauses generally confer no affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or property interests of which the government itself may not deprive the individual." In so holding, the Court declined to permit a child and his mother to recover damages from social workers who had received complaints that the child was being abused by his father, and who had reason to believe that this was the case, but who nevertheless failed to remove the child from his father's custody. *Id.* at 192-93. The child was later beaten by his father so viciously that he fell into a life-threatening coma, "suffer[ing] brain damage so severe that he [was] expected to spend the rest of his life confined to an institution for the profoundly retarded." *Id.* at 193.

In this case, plaintiff, in raising the allegations above, has likewise failed to identify the violation of a constitutional right. Thus, for the same "lack of affirmative right" reasons as the Supreme Court set forth in *DeShaney*, plaintiff cannot maintain a cause of action against defendants for failing to monitor or to follow up on the appropriateness of the placement of LB and CB with Ms. Summers. *See Sperle v. Mich. Dep't of Corr.*, 297 F.3d 483, 490 (6th Cir. 2002) (quoting *Deshaney*, 489 U.S. at 196)) ("In most circumstances, 'a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause.'"). Qualified immunity thus shields these defendants from civil liability in connection with these actions.

One potentially applicable exception to the *DeShaney* rule merits further discussion.[6] Under the "state-created danger" exception, which arises when a "State creates a perilous situation that renders citizens more vulnerable to danger at the hands of private actors," a plaintiff may bring a substantive due process claim where he can establish:

> (1)     an affirmative act by the State that either created or increased the risk that the plaintiff would be exposed to private acts of violence;
>
> (2)     a special danger to the plaintiff created by state action, as distinguished from a risk that affects the public at large; and
>
> (3)     the "requisite state culpability"–defined as "deliberate indifference by the government entity when the entity had time to deliberate on what to do–to establish a substantive due process violation.

*Schroder v. City of Fort Thomas*, 412 F.3d 724, 728 (6th Cir. 2005) (citing cases) (internal quotations omitted). For the reasons below, the Court finds that this exception does not apply to the circumstances of the present case.

Plaintiff has not pointed to an "affirmative act" which would subject the social workers in this case to liability. Sixth Circuit case law illuminates this holding. In *Bukowski v. City of Akron*, 326 F.3d 702, 705 (6th Cir. 2003), police officers investigating a missing person report picked up Lisa Bukowski, a nineteen-year-old woman with a mental handicap, from the home of Leslie Hall, a thirty-nine-year-old man who had lured Lisa to his home by posing over the Internet as an eighteen-year-old disabled man. When Lisa arrived at Leslie's

---

[6] The other exception to the *DeShaney* rule, which arises "when the State takes a person into its custody and holds him there against his will," and which "imposes upon [the State] a corresponding duty to assume some responsibility for [the person's] safety and general well-being," *DeShaney*, 489 U.S. at 199-200, is not relevant to this case.

home, Leslie raped Lisa repeatedly. *Id.* Lisa's parents later sued the police for returning Lisa to Leslie's home at Lisa's request–where Leslie again raped Lisa repeatedly–before her parents arrived at the police station to retrieve their daughter. *Id.* at 706-07. Finding that the officials in *Bukowski* "arguably did nothing to increase [Lisa's] vulnerability to danger," having "merely returned her at her request to [Leslie's] residence," the Court of Appeals for the Sixth Circuit declined to classify the officials' conduct as an "affirmative act" within the meaning of the state-created danger exception to the *DeShaney* rule.

Plaintiff in the present case has likewise failed to allege "affirmative acts" on the part of defendant social workers that would open them up to liability. Plaintiff alleges that defendants "left the children with Ms. Summers for a period of weeks without monitoring or follow[ing] up on the safety or appropriateness of their placement of the children" with Ms. Summers, and "refused to return the children to plaintiff or to secure the safety of the children when [the defendants] were warned of Ms. Summers's conduct and problems" [Doc. 7, ¶ 26]. Neither defendants' alleged failure to monitor the placement of the children with Ms. Summers, nor defendants' alleged refusal to return the children to plaintiff, however, constitutes an "affirmative act" as that term is outlined in *Bukowski*.[7] *See also Cartwright v. City of Marine City*, 336 F.3d 487, 489-90 (6th Cir. 2003) (granting immunity to police

_____

[7] The Court notes that defendants played no role in Ms. Summers's original acquisition of custody over the children in this case. As plaintiff explains in his first amended complaint, he "permitted unsupervised visitation" of the children by Ms. Summers "[a]fter an extended period of supervised visitation," in the belief that Ms. Summers had "changed her ways," and in an "effort to foster a relationship between the children and their mother" [Doc. 7, ¶ 15]. In other words, the children initially came under the (unsupervised) care of Ms. Summers not because of any affirmative act of defendants, but because of the affirmative act of plaintiff placing them in Ms. Summers's care.

officers who picked up an intoxicated man at night from the shoulder of a foggy, unlit highway–a "place of great danger"–and dropped him off at a nearby convenience store–a "place of lesser danger"–where the man later passed out on the highway and was killed). Plaintiff therefore cannot satisfy the first prong of the state-created danger exception to the *DeShaney* rule.

Even assuming that plaintiff could satisfy the first prong of this exception, and further assuming that plaintiff could demonstrate that, to the extent that the affirmative acts plaintiff alleges here created a danger, that danger was specific to the children in this case rather than to the public at large, plaintiff cannot satisfy the third prong of the exception. The third prong, as noted, requires the plaintiff to demonstrate "deliberate indifference by the government [officials] when the [officials] had time to deliberate on what to do."[8] *Schroder*, 412 F.3d at 728 (internal quotations omitted). Cases in the Sixth Circuit also:

> [S]tress that, where a plaintiff claims that a non-custodial substantive due process violation has occurred because of the government's deliberate indifference, something more must be shown–a something that [the Sixth Circuit] ha[s] variously described as "callous[] disregard [for] the risk of injury" . . . or action [taken] "in an arbitrary manner that 'shocks the conscience' or that indicates an[] intent to injure."

*Id.* at 730 (quoting cases).

Here, neither plaintiff's allegations that defendants failed to monitor their placement of the children with Ms. Summers, nor plaintiff's allegations that defendants refused to return

---

[8] The Court assumes for present purposes that the social workers "had time to deliberate on what to do," given that this is not one of those cases which demand "instant judgment." *County of Sacramento v. Lewis*, 523 U.S. 833, 853 (1998).

the children to plaintiff after allegedly being made aware of certain deficiencies in Ms. Summers's custodial situation, evince a "callous disregard for the risk of injury" or "indicate the intent to injure" in a manner which satisfies the third prong of the exception. The Court notes the difficult choice facing the social workers in this case: they could either credit the claims of child abuse brought by Ms. Summers against plaintiff, and permit the children to remain with their biological mother pending a complete investigation of those claims; or they could discredit Ms. Summers's claims, and return the children to the very person against whom the claims had been brought before a full investigation had been made. The Sixth Circuit regularly immunizes state officials faced with difficult choices like these from damages liability for their actions. *See Schroder*, 412 F.3d at 730 ("[T]he practicalities of day-to-day governance require officials to make difficult allocation choices and tradeoffs"; thus, "it is generally not for the courts to compel affirmative steps in one area at the expense of another in weighing competing policy options."). The Court therefore finds the state-created danger exception to the *DeShaney* rule inapplicable in this case. Defendants Miller, Campbell, Harville, and Henderson are shielded by qualified immunity for the allegations of monitoring failures that plaintiff has raised against them.

### 3.     No-Contact Agreement

Defendant Miller contends that she is insulated from civil liability under the doctrine of qualified immunity in connection with her arrival, with law enforcement officers, at plaintiff's home; her accusation that plaintiff had sexually abused LB; and her presentation to plaintiff of a legal document by which plaintiff would have agreed to discontinue contact

with his children [*see* Doc. 15].  Plaintiff argues that qualified immunity does not so insulate defendant Miller, and that these actions furthermore caused him to "experience[] great fear and anguish" [Doc. 7, ¶ 28].

The Court need not undertake the full qualified immunity analysis here, because plaintiff has failed to state a claim for which relief can be granted.  In *Smith v. Williams-Ash*, 520 F.3d 596, 597 (6th Cir. 2008), the Court of Appeals for the Sixth Circuit addressed the liability of a social worker who convinced the parents of two minor children to sign a voluntary agreement temporarily depriving them of their custody of the children.  In that case, Richard Montifore, a Children's Services employee, visited the home of David and Melody Smith in connection with the Smiths' having taken custody of Malake Dancer, a minor who suffered from cerebral palsy.  *Id.* at 598.  Finding the home "so 'filthy' that he felt uncomfortable leaving Malake . . . in the house," Montifore called the police after his visit. *Id.*  The next day, Children's Services assigned Judy Williams-Ash, a social worker, to handle the case.  *Id.*  Ms. Williams-Ash "persuaded the Smiths to consent to a safety plan that removed [Malake] from the Smiths' home and placed [her] with friends in the neighborhood."  *Id.*  When Malake was eventually returned to the Smiths–after seventeen days of separation, during which time the Smiths alleged that Ms. Williams-Ash "ignored their requests for information and threatened to permanently remove [Malake] if they stopped cooperating"–the Smiths sued Williams-Ash in her individual capacity for violating their substantive and procedural due process rights.  *Id.* at 598-99.

The court in *Williams-Ash* found no fault with Ms. Williams-Ash's enforcement of the consented-to safety plan in that case. *Id.* at 600. Further, the court agreed with Judge Posner's observation in *Dupuy v. Samuels*, 465 F.3d 757, 762 (7th Cir. 2006) that the "inherently coercive" nature of the agency's strategy of "forc[ing] parents to sign [a voluntary safety] plan or [else] face the threat of formal removal proceedings" was tantamount "to a plaintiff's legitimate threat to press a case to trial in order to induce a defendant to settle." *Id.* Given that the Sixth Circuit was not willing to entertain a lawsuit against a social worker for persuading a guardian to sign a voluntary safety plan temporarily depriving the guardian of custody over a minor, it follows that the court would be unwilling to entertain a lawsuit against a social worker in her individual capacity who has merely attempted to persuade a guardian to sign a plan by which the guardian would discontinue contact with his children. That is the case here. Plaintiff's claim will be dismissed accordingly.

> **4.** **Transmission and Disclosure of Child Sexual Abuse Allegations to Public School Personnel and Maintenance of Plaintiff's Name on an Internal DCS Registry of "Indicated" Perpetrators of Child Sexual Abuse**

Defendants next contend that plaintiff's allegations that defendants Harville and Henderson, and "possibly" defendants Miller and Pettigrew, transmitted and disclosed to public school personnel in Sullivan County copies of at least one confidential Juvenile Court pleading containing identifying information and allegations of child sexual abuse against plaintiff fail to state a claim upon which relief can be granted [*see* Doc. 15]. Defendants

further contend that plaintiff's allegations that the decision of defendants Miller, Harville, and/or Henderson to place plaintiff's name on an internal DCS registry of "indicated" perpetrators of child sexual abuse without notice or an opportunity to contest that decision, as well as their continued refusal to remove his name from that registry, deprived him of his property and liberty interests in his good name, reputation, and freedom of employment, should also be dismissed for failure to state a claim [*see id.*].

The Court agrees with defendants. These two sets of allegations stem from plaintiff's concern over the negative effects that dissemination of these materials may have on plaintiff's reputation [*see* Doc. 7, ¶¶ 66-67 ("Plaintiff has and had at all material times constitutionally protected liberty and property rights and interests in his reputation, good name, and employability . . . Placement and maintenance of plaintiff's name on such registry deprive plaintiff of his constitutional rights.")]. Nevertheless, "reputation alone is not a constitutionally protected liberty or property interest." *Cutshall v. Sundquist*, 193 F.3d 466, 479 (6th Cir. 1999) (citing *Paul v. Davis*, 424 U.S. 693, 701 (1976)). "Only where the stigma of damage to a reputation is coupled with another interest, such as employment, is procedural due process protection triggered." *Id.*

"Courts recognizing a constitutionally protected right to employment have done so in very limited circumstances." *Id.* A typical example is the "termination[] of government employment where either state law or an agreement between the parties purports to limit the ability of the government to terminate the employment." *Id.* (citing cases). "A charge that merely makes a plaintiff less attractive to other employers but leaves open a definite range

of opportunity does not constitute a liberty deprivation." *Gregory v. Hunt*, 24 F.3d 781, 788 (6th Cir. 1994).

In this case, charges of child sexual abuse lodged against plaintiff and allegedly disseminated by defendants may make plaintiff less attractive to employers if employers are made aware of these allegations. A "definite range of opportunity" remains open to plaintiff despite these charges, however. Plaintiff thus has failed to identify a liberty or property interest sufficient to trigger the protections of the Due Process Clause of the Fourteenth Amendment. Dismissal of these allegations is therefore appropriate.[9]

### 5. Physical Examination

Plaintiff alleges that defendants Harville and Henderson, and "possibly" defendant Pettigrew, instructed Ms. Summers to subject LB to a second physical sexual examination in an attempt to generate verbal statements from LB [*see* Doc. 7, ¶ 43]. The Court of Appeals for the Sixth Circuit has held that a social worker's "decision on whether or not to

_____

[9] The Court notes that the relevant Tennessee regulations provide a potential administrative remedy for plaintiff's complaint that he has been improperly classified as an "indicated" perpetrator of child sexual abuse. These regulations provide that, even when DCS "will not identify or does not intend to identify to any organization or person . . . that it has classified an individual in an 'indicated' report as a perpetrator of . . . child sexual abuse"–in other words, when DCS intends only to place an individual on the internal DCS registry–"[a]n individual whom [DCS] has classified in an 'indicated' report as a perpetrator of . . . child sexual abuse . . . and whose identity shall be placed in the [DCS's] formal registry of perpetrators of abuse . . . shall . . . have the right to a formal file review . . . ." Rules of the Tennessee Department of Children's Services ("RTDCS") § 0250-7-9-.04(2)(a); *see also* RTDCS § 0250-7-9-.06(1) (individual classified as an "indicated" perpetrator of child sexual abuse "may request a formal file review by the [person designated by the Commissioner of the DCS] to determine whether the report has been properly classified as 'indicated.'"). Plaintiff offers no indication that he has pursued the administrative remedy potentially available to him in this case.

have [a] child seen by a [physician] . . . would appear to [be] precisely the type of discretionary judgment call that the qualified immunity doctrine is intended to protect." *Green v. Lorain County Child Servs. Bd.*, No. 98-4562, 2000 WL 553954, at * 3 (6th Cir. Apr. 28, 2000). Qualified immunity thus insulates defendants from civil liability in connection with this allegation.

### D. Whether the Amended Complaint States a Claim for Supervisor Liability

Plaintiff alleges that defendant Miller is "responsible for promulgation and enforcement of policies and procedures of DCS/CPS," and that the "unconstitutionality of the policies and procedures and/or the unconstitutional manner of application of the policies and procedures unreasonably violated and will continue to violate plaintiff's clearly established constitutional rights of which a reasonable person would have known" [Doc. 7, ¶ 72]. Plaintiff raises similar allegations against defendant Henderson [*see id.*, ¶ 116]. Defendants contend that plaintiff cannot maintain a cause of action against defendants Miller and Henderson on the basis of these allegations because these allegations do not state a valid claim for supervisory liability.

The Court agrees with defendants. "[A] supervisory official's failure to supervise, control or train [an] offending individual is not actionable unless the supervisor 'either encouraged the specific incident of misconduct or in some other way directly participated in it.'" *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999) (quoting *Hays v. Jefferson County*, 668 F.2d 869, 874 (6th Cir. 1982)). "At a minimum a plaintiff must show that the official

at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers." *Luttrell*, 199 F.3d at 300.

In this case, plaintiff has accused defendants Miller and Henderson of "fostering and/or permitting an attitude within the DCS/CPS of unaccountability for constitutional violations" [*see* Doc. 7, ¶¶ 107, 116]. None of the steps plaintiff alleges defendants took in "fostering" this attitude, however–including "disregard[ing] . . . any lack of veracity or likely veracity of allegations [made by Ms. Summers]," and "condoning the notion that depriving a targeted person . . . of [his] rights to [his] children is more important than said person's constitutional rights"–rise to the level of a constitutional violation, as discussed *supra* Parts III.C.1, 2, 4, 5. Thus, to the extent plaintiff attempts to impute supervisory liability to defendants Miller and Henderson for the taking of such actions, such liability must be refused.[10]

### E.    State Law Claims

The Court lacks jurisdiction to consider plaintiff's state law claims as the Court has found that dismissal of all of plaintiff's Section 1983 claims against all defendants, in their individual and official capacities, is appropriate. *See Davis v. Holly*, 835 F.2d 1175, 1179 (6th Cir. 1987). Therefore, dismissal of plaintiff's state law claims is appropriate as well.

---

[10] To the extent plaintiff challenges the enforcement of the policies of the DCS by defendants Miller and Henderson, including the adoption and implementation of the permanency plan that DCS devised in this case, the Court notes that the Juvenile Court possesses ultimate oversight of such plans. *See* Tenn. Code Ann. § 37-2-403(a)(2)(A) ("The [juvenile] court must review [a] proposed [permanency] plan, make any necessary modifications and ratify or approve the plan within sixty (60) days of [a] . . . placement.").

## IV.    Conclusion

For the reasons above, defendants' Motion to Dismiss First Amended Complaint [Doc. 14] will be granted.  This case will be dismissed.  The Clerk will be directed to close this case.  An order reflecting this memorandum opinion will be entered.


s/ Thomas A. Varlan
UNITED STATES DISTRICT JUDGE